# UNITED STATES DISTRICT COURT
## DISTRICT OF IDAHO

| | |
|---|---|
| RUSTY PIERCE, | Case No.: 1:17-cv-00380-REB |
| Petitioner, | |
| vs. | **MEMORANDUM DECISION AND ORDER** |
| ANDREW SAUL, Commissioner of Social Security, | |
| Respondent. | |

Pending is Petitioner Rusty Pierce's Petition for Review[1] (Dkt. 1), appealing the Social Security Administration's final decision finding him not disabled and denying his claim for disability insurance benefits. *See* Pet. for Review (Dkt. 1). This action is brought pursuant to 42 U.S.C. § 405(g). Having carefully considered the record and otherwise being fully advised, the Court enters the following Memorandum Decision and Order.

## I. ADMINISTRATIVE PROCEEDINGS

On October 30, 2012, Petitioner Rusty C. Pierce protectively applied for Title II disability and disability insurance benefits. (AR 191.) He alleged disability beginning June 1, 2010. (*Id.*) His claim was denied initially on February 1, 2013 (AR 209) and then again on reconsideration on April 9, 2013. (AR 244.) On April 19, 2013, Petitioner timely filed a Request for Hearing before an Administrative Law Judge ("ALJ"). (AR 231.) Petitioner appeared and testified at a video hearing held on March 19, 2014 before ALJ Barry Robinson while Petitioner was in Boise,

---

[1] Andrew Saul became the Commissioner of the Social Security Administration on June 17, 2019. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Andrew Saul is substituted in as the Respondent in this suit. No further action need be taken to continue this suit by reason of the last sentence of 42 U.S.C. § 405(g).

Idaho and ALJ Robinson was in Albuquerque, New Mexico. (AR 191.) Impartial vocational expert Polly A. Peterson also appeared and testified at the hearing. (*Id.*)

On May 23, 2014, ALJ Robinson issued a Decision denying Petitioner's claim, finding that he was not disabled within the meaning of the Social Security Act. (AR 198.) Petitioner requested review from the Appeals Council and on March 25, 2016 the Appeal Council granted Petitioner's request for review and remanded his case to an ALJ for further development of the record. (AR 205–207.) Petitioner appeared and testified at two live hearings on July 13, 2016 and October 17, 2016 before ALJ Stephen Marchioro[2] in Boise, Idaho. (AR 10.) Impartial medical expert Dr. John Kwock and impartial vocational expert Jerry Gravatt also appeared and testified. (*Id.*)

On January 11, 2017, the ALJ issued a decision denying Petitioner's claim, finding that he was not disabled within the meaning of the Social Security Act. (AR 22.) Petitioner again requested review from the Appeals Council, on March 3, 2017. (AR 391.) On July 7, 2017, the Appeals Council denied Petitioner's Request for Review, making the ALJ decision the final decision of the Commissioner of Social Security. (AR 1.)

Petitioner's administrative remedies having been exhausted, he timely filed the instant action, arguing that "[t]he decision denying Petitioner's claim is not in accordance with the purpose and intent of the Social Security Act, nor is it in accordance with the law, nor is it in accordance with the evidence, but contrary thereto and to the facts and against the evidence, in that Petitioner is disabled from performing substantial gainful activity." Pet. for Review 2 (Dkt. 1). Petitioner contends the ALJ erred by (1) failing to evaluate the opinions of his treating

---

[2] Further references to any "ALJ" in this decision refer to ALJ Marchioro unless otherwise indicated.

providers, as required by the Appeals Council's order of remand; (2) failing to assess an RFC supported by substantial evidence; and (3) failing to provide clear and convincing evidence when determining that Petitioner's allegations of pain and other symptoms were not consistent with the evidence of record. *See generally* Pet'r's Mem. ISO Pet. for Review (Dkt. 12). Petitioner asks for a holding that he is disabled and for a remand for an immediate award of benefits. *Id.* at 20.

## II. <u>STANDARD OF REVIEW</u>

To be upheld, the Commissioner's decision must be supported by substantial evidence and based on proper legal standards. 42 U.S.C. § 405(g); *Trevizo v. Berryhill*, 871 F.3d 664 (9th Cir. 2017). Findings as to any question of fact, if supported by substantial evidence, are conclusive. 42 U.S.C. § 405(g). In other words, if there is substantial evidence to support the ALJ's factual decisions, they must be upheld, even when there is conflicting evidence. *See Treichler v. Comm'r of Social Sec. Admin.*, 775 F.3d 1090, 1098 (9th Cir. 2014).

"Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Ludwig v. Astrue*, 681 F.3d 1047, 1051 (9th Cir. 2012). The standard requires more than a scintilla but less than a preponderance (*Trevizo*, 871 F.3d at 674), and "does not mean a large or considerable amount of evidence." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988).

With respect to questions of fact, the role of the Court is to review the record as a whole to determine whether it contains evidence that would allow a reasonable mind to accept the conclusions of the ALJ. *Richardson*, 402 U.S. at 401; *see also Ludwig*, 681 F.3d at 1051. The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities. *Treichler*, 775 F.3d at 1098. Where the evidence is susceptible to more than one rational interpretation, the reviewing court must uphold the ALJ's findings if they are

supported by inferences reasonably drawn from the record. *Ludwig*, 681 F.3d at 1051. In such cases, the reviewing court may not substitute its judgment or interpretation of the record for that of the ALJ. *Batson v. Comm'r of Social Sec.*, 359 F.3d 1190, 1196 (9th Cir. 2004).

With respect to questions of law, the ALJ's decision must be based on proper legal standards and will be reversed for legal error. *Zavalin v. Colvin*, 778 F.3d 842, 845 (9th Cir. 2015); *Treichler*, 775 F.3d at 1098. Considerable weight must be given to the ALJ's construction of the Social Security Act. *See Vernoff v. Astrue*, 568 F.3d 1102, 1105 (9th Cir. 2009). However, reviewing federal courts "will not rubber-stamp an administrative decision that is inconsistent with the statutory mandate or that frustrates the congressional purpose underlying the statute." *Smith v. Heckler*, 820 F.2d 1093, 1094 (9th Cir. 1987).

### III. DISCUSSION

#### A.    Sequential Process

In evaluating the evidence presented at an administrative hearing, the ALJ must follow a sequential process in determining whether a person is disabled in general (20 C.F.R. §§ 404.1520, 416.920) – or continues to be disabled (20 C.F.R. §§ 404.1594, 416.994) – within the meaning of the Social Security Act.

The first step requires the ALJ to determine whether the claimant is engaged in substantial gainful activity ("SGA"). 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). SGA is work activity that is both substantial and gainful. 20 C.F.R. §§ 404.1572, 416.972. "Substantial work activity" is work activity that involves doing significant physical or mental activities. 20 C.F.R. §§ 404.1572(a), 416.972(a). "Gainful work activity" is work that is usually done for pay or profit, whether or not a profit is realized. 20 C.F.R. §§ 404.1572(b), 416.972(b). If the claimant is engaged in SGA, disability benefits are denied regardless of his medical condition,

age, education, and work experience. 20 C.F.R. §§ 404.1520(b), 416.920(b). If the claimant is not engaged in SGA, the analysis proceeds to the second step. Here, the ALJ found that Petitioner did not engage in substantial gainful activity during the period from his alleged onset date of June 1, 2010 through his date last insured of September 30, 2014. (AR 13.)

The second step requires the ALJ to determine whether the claimant has a medically determinable impairment, or combination of impairments, that is severe and meets the duration requirement. 20 C.F.R. § 404.1520(a)(4)(ii), 416.920(a)(4)(ii). An impairment or combination of impairments is "severe" within the meaning of the Social Security Act if it significantly limits an individual's physical or mental ability to perform basic work activities. 20 C.F.R. §§ 404.1520(c), 416.920(c). An impairment or combination of impairments is "not severe" if it does not significantly limit the claimant's physical or mental ability to do basic work activities. 20 C.F.R. §§ 404.1522, 416.922. If the claimant does not have a severe medically determinable impairment or combination of impairments, disability benefits are denied. 20 C.F.R. §§ 404.1520(c), 416.920(c). Here, the ALJ found that, through the date last insured, Petitioner had the following severe impairments: "obesity, left shoulder degenerative joint disease, left knee degenerative joint disease status-post arthroscopic surgeries and total knee arthroplasty, lumbar degenerative disc disease, and left carpal tunnel syndrome." (AR 13.)

The third step requires the ALJ to determine the medical severity of any impairments; that is, whether the claimant's impairments meet or equal a listed impairment under 20 C.F.R. Part 404, Subpart P, Appendix 1. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). If the answer is yes, the claimant is considered disabled under the Social Security Act and benefits are awarded. 20 C.F.R. §§ 404.1520(d), 416.920(d). If the claimant's impairments neither meet nor equal a listed impairment, his claim cannot be resolved at step three and the evaluation proceeds

to step four. 20 C.F.R. §§ 404.1520(e), 416.920(e). Here, the ALJ found that Petitioner did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. (AR 13–16.)

The fourth step of the evaluation process requires the ALJ to determine whether the claimant's residual functional capacity ("RFC") is sufficient for the claimant to perform past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). An individual's RFC is his ability to do physical and mental work activities on a sustained basis despite limitations from his impairments. 20 C.F.R. §§ 404.1545, 416.945. An individual's past relevant work is work he performed within the last 15 years or 15 years prior to the date that disability must be established, as long as the work was substantial gainful activity and lasted long enough for the claimant to learn to do the job. 20 C.F.R. §§ 404.1560(b), 404.1565, 416.960(b), 416.965. Here, the ALJ determined that Petitioner had the residual functional capacity:

> to perform sedentary work as defined in 20 CFR 404.1567(a) except he could frequently push and/or pull with his non-dominant left upper extremity. He could occasionally operate foot controls with his left lower extremity. He could never climb ladders, ropes, or scaffolds. He could frequently balance. He could occasionally stoop and climb ramps or stairs. He could never crouch or crawl. He could frequently reach with his left upper extremity, but only occasionally reach overhead and frequently handle with his left upper extremity. He had to avoid all exposure to unprotected heights and unguarded, moving mechanical parts. He could tolerate occasional exposure to vibration.

(AR 16.) The ALJ further found that Petitioner was unable to perform any of his past relevant work through his date last insured. (AR 20.)

In the fifth and final step, if it has been established that a claimant can no longer perform past relevant work because of his impairments, the burden shifts to the Commissioner to show that the claimant retains the ability to do alternate work and to demonstrate that such alternate work exists in significant numbers in the national economy. 20 C.F.R. §§ 404.1520(a)(4)(v),

416.920(a)(4)(v), 404.1520(f), 416.920(f); *see also Garrison v. Colvin*, 759 F.3d 995, 1011 (9th Cir. 2014).  If the claimant can do such other work, he is not disabled; if the claimant is not able to do other work and meets the duration requirement, he is disabled.  Here, the ALJ found that Petitioner's RFC is compatible with work as a "surveillance systems monitor," "call out operator," or "counter clerk."  (AR 21.)  The ALJ further found that these jobs exist in significant numbers in the national economy.  (AR 21.)

Based on the finding that Petitioner could perform jobs that exist in significant numbers in the national economy, the ALJ ultimately concluded that Petitioner "was not under a disability, as defined in the Social Security Act, at any time from June 1, 2010, the alleged onset date, through September 30, 2014, the date last insured."  (AR 21.)

## B.    Analysis

Petitioner raises three issues with the ALJ's decision.  First, he argues the ALJ erred by failing to evaluate the opinions of his treating providers.  Second, he argues the ALJ failed to provide clear and convincing reasons for determining that his allegations of pain and other symptoms were not consistent with the evidence in the record.  Third, he argues the ALJ erred when assessing Petitioner's RFC.  *See generally* Pet'r's Mem. ISO Pet. for Review (Dkt. 12).

However, Respondent argues that Petitioner's framing of the issue challenges whether the ALJ erred by failing to comply with an order of remand issued by the Appeals Council.  Resp't's Br. 3–9 (Dkt. 16).  Respondent contends that this Court should not consider whether the ALJ complied with the Appeals Council's remand order, quoting *Tyler v. Astrue*, 305 Fed. Appx. 331, 332 (9th Cir. 2008) (unpublished) ("federal courts only have jurisdiction to review the final decisions of administrative agencies… When the Appeals Council denied review of the ALJ's second decision, it made that decision final… and declined to find that the ALJ had not complied

with its remand instructions."). Resp't's Br. 5 (Dkt. 16). As to that discrete issue, the Court

agrees that Petitioner cannot prevail on a challenge that the ALJ committed reversible legal error

by failing to comply with the Appeals Council's order of remand, and it will therefore not

consider arguments in this vein.

Each of Petitioner's three assignments of error will be addressed in turn, with a view

toward considering them as legal challenges to the ALJ's decision rather than as non-reviewable

challenges to the ALJ's compliance with the Appeals Council's order of remand.

### 1. The ALJ Did Not Err by Failing to Evaluate Treating Providers' Opinions.

Petitioner contends the ALJ did not properly address the treating provider opinions and

did not properly assess the medical evidence, as required by 20 C.F.R. § 404.1527(e) and SSR

96-6p. Pet'r's Mem. ISO Pet. for Review 10–14 (Dkt. 12). Petitioner raises four arguments.

First, that the ALJ erred by ignoring the opinion of Dr. William Binegar, a treating physician, in

assigning an RFC for sedentary work; second, that the ALJ improperly gave considerable weight

to the opinion of impartial medical expert Dr. John Kwock, who did not treat or examine

Petitioner; third, that the ALJ improperly was dismissive of the opinion of Mr. Fred J. Friel, PA-

C, one of Petitioner's treating providers; and, fourth, that the ALJ erred in evaluating the

opinions of Dr. George Nicola and Dr. Ronald Kristensen, both treating physicians.

There is no traction to Petitioner's argument that the ALJ erred by failing to consider, or

by improperly considering, a medical opinion of Dr. Binegar, whose name appears just three

times in Petitioner's memorandum supporting his Petition for Review. It appears twice in the

section summarizing the evidence of record, referring to Exhibit 14F (AR 827–853) in both

cases, and once in the section heading regarding Petitioner's instant assignment of error. Pet'r's

Mem. ISO Pet. for Review 5, 10 (Dkt. 12).  Dr. Binegar's name is not otherwise mentioned in Petitioner's opening memorandum.

Petitioner does not explain how the ALJ may have erred in his evaluation of Dr. Binegar's opinions or treatment records.  Exhibit 14F of the record contains medical records from March 2013 through August 2013 from an unspecified facility.  Dr. Binegar's name appears throughout the exhibit, but it appears that the Petitioner was seen some days by Dr. Binegar and other days by Mr. Friel, a certified physician assistant working in Dr. Binegar's office.  Regardless, Petitioner identifies no specific medical opinion or other assessment of some sort given by Dr. Binegar that Petitioner contends the ALJ ignored.  Accordingly, he cannot prevail on an argument that the ALJ erred by ignoring any such opinion.[3]

Next, Petitioner challenges the ALJ's reliance on the impartial medical expert testimony of Dr. John Kwock at the supplemental hearing.  He suggests both that Dr. Kwock ignored record evidence when formulating his opinion and that it was improper for the ALJ to credit Dr. Kwock's opinion (because Dr. Kwock was a non-treating, non-examining physician) over that of Mr. Friel (a certified physician assistant who treated Petitioner).

Petitioner contends that Dr. Kwock had not reviewed all the evidence in the file, including Petitioner's own testimony at the prior hearing or the "E and F sections" from the record.  *Id.* at 11–12.  More to the point, Petitioner argues that Dr. Kwock's explanations were contradictory and inconsistent with the record.  Petitioner notes that when counsel inquired, "So in terms of zero out of five strength in the left rhomboid and left serratus interior muscle groups,

_____

[3] In Petitioner's reply memorandum, he indicates that Mr. Friel "was working in conjunction with Dr. William Binegar to treat" Petitioner's shoulder pain.  Pet'r's Reply Br. 7 (Dkt. 17).  Dr. Binegar's name appears on each of the records signed by Mr. Friel.  To the extent Petitioner's argument is that the ALJ erred in evaluating Mr. Friel's opinion, such argument is addressed below.

**MEMORANDUM DECISION AND ORDER – 9**

how would that impact the use of the left arm?", Dr. Kwock responded that Petitioner "would have trouble picking up the arm above waist level." (AR 54.) Counsel inquired how, in such a circumstance, Petitioner "would be capable in a work setting of overhead reaching on an occasional basis throughout the average workday … [or] frequent reaching with that same arm in all other directions throughout the workday?" (AR 55.) Dr. Kwock replied at length:

> I would refer you to exhibit 8F, page 2 [AR 800]. And that's an examination performed by an orthopedic surgeon instead of a pain specialist. Now I don't know what specialty the pain specialist had that you were referring to. I didn't write it down in my note. But this examination in 8F, page 2, was performed by an orthopedic surgeon. And in that examination, the claimant was able to do a active fore flexion, probably prompting to 140 degrees bilaterally. That means that he can reach his arm in front of him, okay, to 140 degrees. And I think most people would accept 150 degrees as being normal. He has near five over five -- spinatus test with negative drop sign which means that he can actually lift his arm up, reduct his shoulder, his deltoids almost near five over five strength. And without a drop out test which means that if you push on him, he resists, you know, pushing downward. On forward elevation and lateral -- reduction there is significant scapular winging of the inferior -- consistent with the related palsy. He can voluntarily wing his interior scapula significantly. Now what this sort of means is that when you lift things, you use your arm. Your shoulder blade has to be held in place because … your arm is basically attached to the shoulder blade. And if you can't stabilize the scapula, then to tell you the truth, the effectiveness of you raising your arm, getting it ahead of you, and just simply moving the arm around, there's the limit.
>
> But it doesn't mean that you can't use the arm. And I think this examination by an orthopedic surgeon would reflect the fact that this individual can, and in fact on further on his examination, he said on scapular stabilization manually and that means you can -- the examiner takes his hand and just simply grabs the shoulder blades and more or less, stabilizes it for the individual…. He observed that the claimant can actively forward elevate without any pain at all with scapular stabilization. He has a negative impingement sign, you know, the Hawkins and maybe the Cross abduction, all these -- for rating shoulder impingement.
>
> And so again, like I said, this individual -- would have trouble, difficulty using the arm with power but it is not as if he can't use the arm.

(AR 55–57.) This testimony was broadly consistent with Dr. Kwock's comments just before this line of inquiry, during which he opined that Petitioner

> has some weakness about the shoulder girdle -- control of the arm if you understand what I'm saying. And so my take on it is that he still can do things as far as that left upper extremity is concerned. But he does have weakness about the shoulder girdle.

Therefore he will not be able to lift, you know, weights, carry them in the fashion that we typically think of somebody picking up something and carrying it. But it's not as if the left arm is totally useless and you know, afunctional.

(AR 54.) Counsel sought to confirm that Dr. Kwock's opinion of Petitioner's reaching capacity was in the context of a competitive workplace rather than in the conditions of an examination or therapy, and Dr. Kwock said that "given the record and given that orthopedic examination, it is my opinion that this claimant in a competitive work environment, given the condition that he does have can reach overhead with the left arm on an occasional basis. All other reaching with the left arm on a frequent basis, and can push and pull with the left arm still on a frequent basis. That is what I am saying." (AR 58.) Dr. Kwock also confirmed that his assessment took into account Petitioner's subjective pain. (AR 58–59.) When counsel inquired further into the subject of pain, Dr. Kwock testified that Petitioner's shoulder impingement "is a condition that is commonly seen and still people can work through those issues also. It doesn't automatically render them unable to maintain [work] as far as that shoulder, with shoulder impingement is concerned…. But shoulder impingement issues also exist in the absence of a scapular instability, and it does not necessarily prevent an individual from working." (AR 60–61.)

The ALJ gave Dr. Kwock's testimony and opinion "considerable weight" on the basis that Dr. Kwock "is an orthopedic surgeon and is an expert in the field concerning the claimant's left knee and shoulder issues. He also reviewed the record in its entirety prior to the hearing, and he listened to the claimant's testimony. Moreover, he provided detailed explanations, with citations to the record concerning his findings, and he withstood vigorous questioning by the claimant's attorney and was able to justify his opinions based on his considerable professional experience in the orthopedic field." (AR 19.) The ALJ additionally noted that "Dr. Kwock testified he had reviewed the claimant's records in whole." (*Id.*) Indeed, during the hearing the

ALJ told Dr. Kwock "we forwarded you the E and F sections from the case file for your review… there are no additional exhibits." (AR 50.) Dr. Kwock confirmed that he had exhibits "up to 32F," which is the last exhibit in the present record. (*Id.*) The record does not definitively indicate that Dr. Kwock lacked any portion of the record. Although the record is silent as to whether Dr. Kwock had reviewed Petitioner's hearing testimony at the subsequent hearings, as Petitioner alleges, Petitioner does not assert whether or how such testimony would have changed Dr. Kwock's testimony or opinions.

Petitioner faults the ALJ for crediting Dr. Kwock's testimony, as a non-treating, non-examining physician, over the medical records prepared by certified physician assistant Mr. Friel, who treated Petitioner. The ALJ noted that Mr. Friel "was a pain specialist who was prescribing opioids. Thus, his ability to gauge functional ability of the shoulder is given limited weight." (AR 19.) The ALJ also pointed out that one of Mr. Friel's records indicated Petitioner had a normal gait despite alleging knee pain. (AR 18–19, 829.) Moreover, the ALJ noted a "sharp contrast" between Mr. Friel's March 2013 record, which indicated a subjective rating of 9 out of 10 chronic shoulder pain, and a November 2012 opinion by Dr. Chopp, which indicated that Petitioner had no shoulder pain if the shoulder was not abducted beyond shoulder height. (AR 18, 800, 827.) Petitioner argues the ALJ fell short of providing clear and convincing reasons sufficient to reject the opinion of a treating medical provider, implying also that it was error to adopt Dr. Kwock's opinion while it remained inconsistent with the opinion of a treating provider.

To reject the opinion of a treating physician, an ALJ must provide specific, legitimate reasons for doing so. *Murray v. Heckler*, 722 F.2d 499, 502 (9th Cir. 1983). If a treating physician's opinion is not contradicted by another doctor, an ALJ must set forth clear and

convincing reasons to disregard the treating physician's opinion. *Baxter v. Sullivan*, 923 F.2d 1391, 1396 (9th Cir. 1991). But these standards apply only to "medical opinions," which are defined by Social Security regulations as "statements from acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." 20 C.F.R. § 404.1527(a)(1). As of the date Petitioner filed his claim, physician assistants were not considered "acceptable medical sources" and therefore their opinions were not entitled to the same deference as the opinions of physicians and other acceptable medical sources.[4] 20 C.F.R. §§ 404.1502(a), 404.1527(f).

But regardless of the standard applied, the ALJ did not err in evaluating the significance of the medical records Mr. Friel generated. The ALJ was entitled to rely on Dr. Kwock's testimony that Mr. Friel's findings of 0/5 left rhomboid strength and 0/5 left serratus anterior strength (AR 829) were not disabling (AR 54). Stated differently, the ALJ did not necessarily ignore Mr. Friel's findings; crediting Dr. Kwock's testimony does not preclude agreeing with Mr. Friel's findings.

Moreover, and as the ALJ noted, Petitioner's subjective reporting to Mr. Friel of chronic pain at a 9 out of 10 level in March 2013 sharply contrasts with his November 2012 report to Dr. Chopp (an acceptable medical source) that he was pain-free if he did not raise his arm beyond shoulder height. And although the ALJ did not cite it, Petitioner subsequently reported a subjective pain level as low as 3–4 on May 1, 2013, one week after Dr. Binegar had treated him

---

[4] Per 20 C.F.R. § 404.1502(a)(8), licensed physician assistants practicing within their licensed scope of practice are considered acceptable medical sources for claims filed on or after March 27, 2017. Petitioner's claim was filed on October 30, 2012 – long before this change in the regulations.

with a steroid injection in his shoulder. (AR 842, 843.) The ALJ also distinguished, reasonably and appropriately, between Mr. Friel's status as a pain specialist and Dr. Kwock's status as an orthopedic expert. (AR 19.) The ALJ perceived that Dr. Kwock's subject-area expertise placed him in a better position than Mr. Friel to gauge the functional ability of Petitioner's shoulder, even though Dr. Kwock did not treat or examine Petitioner while Mr. Friel did. Additionally, Mr. Friel's medical report indicates that Petitioner's "[f]unctional impairment is very severe – when present the patient is unable to carry out any daily activities. The pain interferes with sleep regularly." (AR 827.) But this is based on Petitioner's own subjective reporting and not by Mr. Friel's objective evaluation of Petitioner. Nor does it specifically describe Mr. Friel's assessment of the scale or scope of any functional impairments. Finally, the same record indicates that Petitioner has been experiencing symptoms for "1 year" (AR 827), which again is inconsistent with Dr. Chopp's record four months earlier stating that Petitioner's pain was only present when he raised his arm above shoulder height.

For all these reasons, the ALJ did not err in evaluating the medical findings or opinions of either Dr. Kwock or Mr. Friel. Mr. Friel's opinion was not entitled to special weight as the opinion of a treating acceptable medical source. Regardless, the ALJ offered specific, legitimate, clear and convincing reasons for rejecting it.[5] Moreover, Petitioner has not shown the ALJ erred by giving considerable weight to the opinions of Dr. Kwock.

---

[5] Petitioner argues in his reply brief that Mr. Friel was an acceptable medical source under 20 C.F.R. § 416.913 because he was part of an "interdisciplinary team" with Dr. Binegar. This argument holds no merit because such "interdisciplinary teams" were no longer recognized as acceptable medical sources when Petitioner filed his claim. The case Petitioner relies on to apply the outdated regulation, *Gomez v. Chater*, 74 F.3d 967 (9th Cir. 1996), has not been good law since before Petitioner filed his claim. *Boyd v. Colvin*, 524 Fed. Appx. 334, 335 (9th Cir. 2013) (unpublished) (citing *Hudson v. Astrue*, 2012 WL 5328786 at *4 n.4 (E.D.Wash. Oct 29, 2012)).

Finally, Petitioner argues the ALJ improperly minimized the treatment Petitioner has undergone for his left knee. He points out that Dr. George Nicola performed five surgical procedures on Petitioner's knee (AR 544, 549, 864, 894, 929) and Dr. Ronald Kristensen performed a second left knee replacement/revision only three months after the ALJ stated Petitioner was doing well (AR 1028). Petitioner interprets these facts as indicating that Petitioner was not doing well with respect to his knee and that he was not entirely functional at a level to support sustained gainful activity prior to the date last insured.

It is unclear what argument Petitioner tries to raise with respect to his left knee limitations. The ALJ referred a number of times to Petitioner's left knee history and capability. The ALJ found that Petitioner was severely impaired by, among other things, "left knee degenerative joint disease status-post arthroscopic surgeries and total knee arthroplasty." (AR 13.) He expressly considered whether Petitioner's knee limitations satisfied the requirements of Listing section 1.02(A) but found that "the evidence established effective ambulation." (AR 14–15.) He also expressly considered Petitioner's allegation that pain and dysfunction in his left knee rendered him unable to perform work activity, finding that Petitioner was not entirely credible on this point.[6] (AR 17.) He mentioned Petitioner's "history of left knee arthroscopies in 1993 and 2008." (AR 17.) He noted allegations of knee pain in June 2010 but also an absence of reported knee pain during a treadmill stress test. (AR 17.) He also noted that at least some knee pain "was caused by a meniscal tear identified prior to the alleged onset date that did not prevent the claimant from attempting firefighter training." (AR 17.) The ALJ devoted a full paragraph to more recent treatments to Petitioner's knee:

> Thereafter, he underwent arthroscopic chondroplasty and excision of a torn lateral left knee meniscus on November 18, 2011. (Ex. lF/29.) By November 29, 2011, he

[6] The ALJ's assessment of Petitioner's credibility is further discussed in the next section.

reported he was "doing wonderfully", with no significant pain. He ambulated normally, and he did not require pain medication. (Ex. lF/14). He later underwent partial knee replacement in December 2013, with medial and lateral patellar release arthroscopy in June 2014, followed by patella revision and scar tissue debridement on September 8, 2014. (Exs. 19F; 22F/l). Nonetheless, physical therapy records show he was doing well by the expiration of the date last insured in September 2014. On September 25, 2014, he reported he was able to move with less pain, and pain had decreased with therapy. He rode an exercise bike for 15 minutes that day, underwent manual range of motion therapy, and did some left leg weight presses. (Ex. 27F/24). Indeed, he was canceling several therapy appointments by March 2015, indicating symptoms had improved. (Ex. 27F/2-5). In December 2015, the claimant admitted he was doing well with his left knee arthroplasty, and he was able to do most activities. (Ex. 28F/1). This supports the finding that symptoms would not have prevented work activity within the residual functional capacity as of the expiration of the date last insured.

(AR 17–18.) Ultimately, the ALJ found Petitioner's left knee impairment was consistent with an RFC to perform sedentary work with additional limitations, including never crouching or crawling. (AR 16.)

Petitioner's challenge to the ALJ's findings about the severity of his left knee impairments or functional limitations amounts to arguing that the ALJ's decision is not supported by substantial evidence. The ALJ did not mention Dr. Kristensen's second left knee replacement/revision; however, this is not enough to show that the ALJ's findings were insufficient. The knee replacement occurred after Petitioner's date last insured, so it is of limited relevance. More to the point, the ALJ's decision discussed Petitioner's left knee, including related medical history, at great length. Nothing in Petitioner's argument calls into question the sufficiency of the ALJ's evaluation of the severity of, or the functional limitations imposed by, Petitioner's left knee impairment. The ALJ's decision was based on substantial evidence in this regard.

In sum, Petitioner has not shown that the ALJ erred in evaluating the medical evidence and opinions of record.  For this reason, the Court cannot grant Petitioner the relief he seeks on this issue.

**2. The ALJ Did Not Err in Evaluating Petitioner's Credibility.**

Petitioner contends the ALJ rejected Petitioner's testimony about the severity of his symptoms without providing specific, clear and convincing reasons for doing so.  Pet'r's Mem. ISO Pet. for Review 14–17 (Dkt. 12).  He argues that the ALJ took facts out of context when finding that Petitioner's service as a volunteer firefighter and Petitioner's failure to complain about knee pain during a four-minute treadmill test indicated that his knee impairment was not as severe as he alleged.  Petitioner also argues that the ALJ's reliance on a medical record indicating that he lifted weights as a hobby was not a clear and convincing reason to discredit his testimony about the severity of his shoulder impairment.  He next argues that his testimony should not have been discredited on the basis that he canceled physical therapy appointments, given that the reason for such cancellations was that he was concerned his lymphoma had become active.  Finally, he challenges the ALJ's finding that "[i]n December 2015, the claimant admitted he was doing well with the left knee arthroplasty, and he was able to do most activities. (Ex. 28F/1 [AR 1016].)  This supports the finding that symptoms would not have prevented work activity within the residual functional capacity as of the expiration of the date last insured."  (AR 18.)  Petitioner argues that this finding demonstrates that he continued to have significant pain and limitations despite physical therapy and pain management, rather than that his testimony regarding the severity of his knee impairment was not credible.

Respondent argues the ALJ provided valid reasons to reject Petitioner's subjective complaints.  Resp't's Br. 9–16 (Dkt. 16).  Respondent notes the ALJ's recitation of a medical

record from a November 29, 2011 visit to the Oregon Orthopedic & Sports Medicine Clinic during which Petitioner said "he is doing wonderful.  He is having no significant pain.  He is up and ambulating without difficult[y] and not taking pain pills."  (AR 17, 549.)  Respondent also points to other portions of the ALJ's decision in which the ALJ said

> physical therapy records show he was doing well by the expiration of the date last insured in September 2014. On September 25, 2014, he reported he was able to move with less pain, and pain had decreased with therapy. He rode an exercise bike for 15 minutes that day, underwent manual range of motion therapy, and did some left leg weight presses. (Ex. 27F/24 [AR 1011]). Indeed, he was canceling several therapy appointments by March 2015, indicating symptoms had improved. (Ex. 27F/2-5 [AR 989–992]). In December 2015, the claimant admitted he was doing well with his left knee arthroplasty, and he was able to do most activities. (Ex. 28F/1 [AR 1016]).

(AR 17–18; bracketed citations to AR supplied).

Cancellation of therapy appointments does not necessarily indicate symptoms had improved and the fact of such cancellations alone is not a clear and convincing reason to discredit Petitioner's subjective testimony about the severity of his impairments.  However, eliminating one of the ALJ's stated reasons for discrediting Petitioner's testimony does not warrant reversal if the ALJ otherwise supplied clear and convincing reasons for discrediting such testimony.  *Carmickle v. Comm'r*, 533 F.3d 1155, 1163 (9th Cir. 2008).  The ALJ did just that.  The remainder of the quoted paragraph from the ALJ's decision contains clear and convincing reasons for rejecting Petitioner's testimony about the severity of his limitations – specifically, there is substantial medical evidence in the record that is inconsistent with Petitioner's testimony, such as that he "was doing well," he had "less pain," and "he was able to do most activities."  These alone would be enough to support the ALJ's credibility determination.

Respondent also argues that although Petitioner did testify that his role as a volunteer firefighter involved instructing others in equipment maintenance and "hanging out with the guys

down there" (AR 143), the record also discloses that Petitioner listed his occupation as "firefighter" and one of his hobbies as "fighting fires" in 2011 (AR 541.)  The record also contains a "medical release form" from the Hubbard Fire District, dated April 16, 2010, in which Dr. Terrence A. Sedgewick signed off on Petitioner's ability to "return to full active duty."  (AR 566.)  The form listed "examples of functions which a firefighter may be required to perform," including "[l]ift, drag or carry items up to and including human beings, … climb ladders, … [and] crawl on hands and knees." [7]  (AR 566.)

The ALJ was not required to accept Petitioner's testimony that his volunteer firefighter work was physically limited, especially where Dr. Sedgewick's record indicated Petitioner was able to engage in the full range of functions firefighters perform.  Petitioner's own written remark that his hobbies include "fighting fires" implies that he directly fought fires rather than served only in a training or support capacity.  The inconsistency discerned by the ALJ between Petitioner's testimony and the other evidence of record is a clear and convincing reason for rejecting Petitioner's credibility.

Respondent next suggests that Petitioner's failure to note knee pain during a four-minute treadmill test in April 2010 (AR 614) is inconsistent with his July 2016 hearing testimony that "the farthest I can walk is a block before my knee is swollen up … just throbbing and hot."  (AR 107.)  There is an arguable inconsistency in those details, but more than six years passed between these events and neither event occurred within the period between the alleged onset date and the date last insured.  On balance, the Court finds that the ALJ's statement that Petitioner failed to

---

[7] This April 16, 2010 form predates the alleged onset date by less than two months, making it relevant to whether he was incapable of performing work as of his alleged onset date. Nothing in Petitioner's arguments suggests that his capabilities changed significantly in the brief period between these two dates.

report knee or shoulder pain during the treadmill test is not a clear and convincing reason for discrediting his testimony. Again, however, elimination of one purported reason to discredit a claimant's testimony does not constitute reversible error if the ALJ otherwise provided clear and convincing reasons to discredit him. *Carmickle*, 533 F.3d at 1163.

Respondent also challenges Petitioner's contention that the ALJ's "one-time reference to weight-lifting," Pet'r's Mem. ISO Pet. for Review 16 (Dkt. 12), was out of context. Resp't's Br. 13 (Dkt. 16). Respondent points out that there are several references to Petitioner's weight-lifting in the record, rather than just one such reference. (AR 149, 541, 808, 982.) Petitioner asserts that at least one of these references describes a prior hobby of his youth (AR 149), but the 2012 record he references uses the present tense: "[h]e does do quite a bit of weight lifting and his shoulder seems strong." (AR 808.) Thus, there is an inconsistency between the medical record and Petitioner's testimony about the record. An ALJ may rely on such inconsistencies in rejecting a claimant's subjective complaints. *Parra v. Astrue*, 481 F.3d 742, 750 (9th Cir. 2007). The ALJ therefore offered a clear and convincing reason to discredit Petitioner's testimony both because his testimony was inconsistent with a medical record and because there is record evidence that the fact he continued to engage in weight-lifting meant he was not as limited as he alleged.

Although some of the ALJ's reasons to discredit Petitioner's testimony are not "clear and convincing" reasons, other reasons do satisfy that standard. Viewed in total, there were clear and convincing reasons to discredit Petitioner's subjective testimony regarding the severity of his symptoms.

### 3. The ALJ Did Not Err in Assessing Petitioner's RFC.

Petitioner contends the ALJ erred by assigning him an RFC that did not include all functional limitations. Pet'r's Mem. ISO Pet. for Review 17–20 (Dkt. 12). He argues that the ALJ improperly relied on Dr. Kwock's testimony, improperly rejected the opinion of treating providers, and improperly rejected Petitioner's testimony. He asserts that "[t]here is ample objective evidence in the record to support that [Petitioner] could not functionally utilize his left hand." *Id.* at 19. He also argues that the record supports his testimony that he would have to prop his leg on a stool to work through five eight-hour work days per week and that the record does not support the ALJ's implicit finding that he would need less than 10% time off task during the typical work day to elevate his leg.[8]

Relating Petitioner's arguments on this issue to the ALJ's evaluation of Dr. Kwock's opinions or Petitioner's own credibility, they are unavailing because the Court has found no error in the ALJ's treatment of such matters, as described above. Petitioner's remaining arguments ask the Court to reweigh the evidence. The Court acknowledges that Petitioner strongly believes that the ALJ should have assessed a far more limiting RFC, which would have necessitated a finding of disability. But Petitioner does not cite to specific record evidence that negates or invalidates the evidence on which the ALJ relied in assessing his RFC. The ALJ did cite substantial evidence from the record supporting his RFC assessment (AR 16–20).

Petitioner also contends that the ALJ "completely neglects to evaluate all of the evidence, despite its demonstration of an objective basis for [Petitioner's] shoulder pain and weakness."

---

[8] The vocational expert who appeared at the second ALJ hearing in this matter testified that there are no jobs available in significant numbers in the national economy for a person who would miss more than one day per month on a regular and consistent basis or who would be off task more than 10% per day for any reason (including because he needed to elevate his leg in such a way that he could not perform the job). (AR 118–119.)

Pet'r's Mem. ISO Pet. for Review 20 (Dkt. 12).  But Petitioner's briefing does not describe specific evidence overlooked by the ALJ that, if considered, would have undermined the ALJ's findings.  The ALJ need not discuss every piece of evidence in a case.

More significantly, Petitioner misconstrues the applicable standards[9] when suggesting that the evidence demonstrates an "objective basis" for his "shoulder pain and weakness."  The record contains objective evidence of Petitioner's shoulder impairment, which the ALJ characterized as "left shoulder degenerative joint disease" resulting in a severe impairment.  (AR 13.)  The relevant inquiry is whether such pain, weakness, or other impairment is disabling, either at Step 3 because an impairment or combination of impairments meets or medically equals a listing in 20 C.F.R. Part 404, Subpart P, Appendix 1, or at Step 5 because the functional limitations resulting from the impairments preclude Petitioner from engaging in substantial gainful activity.  Moreover, it is the ALJ's responsibility to determine credibility, resolve conflicts in medical testimony, and otherwise resolve ambiguities in the record.  *Treichler*, 775 F.3d at 1098.  Petitioner has not shown the ALJ has failed to faithfully carry out those functions in this case.  Stated differently, the ALJ would have been within his authority to make different findings in Petitioner's case, including a finding that Petitioner was disabled, based on the evidence of record.  Here, the ALJ concluded that Petitioner is not disabled, even though Petitioner would have weighed the evidence differently.  His RFC assessment is supported by substantial evidence.

---

[9] Petitioner invokes SSR 96-8p, an interpretive ruling explaining how an ALJ is to assess a claimant's RFC, but he does not explain how he thinks the ALJ failed to comply with its requirements.

## IV. **CONCLUSION**

Petitioner has not shown that the ALJ erred, either by improperly evaluating medical or other opinions in this case, by improperly discrediting Petitioner's testimony, or by improperly assessing Petitioner's RFC. Accordingly, the ALJ's decision is supported by substantial evidence and it will be upheld. Petitioner's Petition for Review will be denied.

## V. **ORDER**

Based on the foregoing, Petitioner's Petition for Review (Dkt. 1) is **DENIED,** the decision of the Commissioner is **AFFIRMED,** and this action is **DISMISSED** in its entirety, with prejudice.

DATED: September 26, 2019

Honorable Ronald E. Bush
Chief U.S. Magistrate Judge